Filed 12/16/21 In re D.G. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.G. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E075167 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J266439 & J266440) |
| v. | OPINION |
| K.K., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Christopher B. Marshall, Judge. Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Steven O'Neill, Interim County Counsel, Pamela J. Walls, Special Counsel, for Plaintiff and Respondent.

1

# I

## INTRODUCTION

K.K. (Mother) appeals from a juvenile court order terminating her parental rights to her 11-year-old son G.G.-K. (G.) and nine-year-old son D.G.-K. (D.).[1]  (Welf. & Inst. Code, § 366.26.)[2]  Mother contends the juvenile court erred in not applying the beneficial relationship exception to adoption set forth in section 366.26, subdivision (c)(1)(B)(i). We find no error and affirm the judgment.

# II

## FACTUAL AND PROCEDURAL BACKGROUND[3]

The family came to the attention of the San Bernardino County Children and Family Services (CFS) on July 18, 2016, when a referral was received alleging Mother and the children were involved in a car accident and Mother fled the scene with her then six-year-old and four-year-old sons.  In addition, one of the boys was not in a safety car seat.  The social worker responded to the referral and interviewed the family.  Mother denied she was driving the vehicle.  However, D. reported that Mother was driving. Mother gave D. a harsh look and called him a liar.  D. insisted that Mother was driving.

---

[1]  J.G. (Father) is not a party to this appeal.

[2]  All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

[3]  The factual and procedural background until the boys were placed in a permanent plan living arrangement (PPLA) with the goal of adoption is taken from this court's prior nonpublished opinion in case No. E073008 unless otherwise noted.  (*K.K. v. Superior Court* (Oct. 3, 2019, E073008) [nonpub. opn.].)

Mother would only allow the children to be interviewed in her presence. When G. stated that Mother spanked him with a belt, Mother accused G. of lying. Mother reported that she and the children lived with the maternal grandfather. When the children reported that was not true, Mother called them liars. The children smelled like they had not bathed in a while and when asked what they had eaten that day, Mother answered for them and told them not to lie about it. Mother stated that she used marijuana but denied use of any other substances. Mother was arrested for outstanding warrants and cited for child endangerment but was released before the detention hearing.

Mother wanted the children to be released to the maternal grandfather, who had a long history of arrests. When Mother was informed that CFS would not allow the children to be placed with the maternal grandfather, she remembered Father's phone number. Father was at the hospital in the parking lot. Father reported that he knew Mother was homeless and that the children were not properly cared for but did not apply for custody of the children because he feared Mother would disappear with the children.

On July 20, 2016, petitions were filed on behalf of the children pursuant to section 300, subdivision (b) (failure to protect). The following day, the children were formally removed from Mother's custody and detained with Father on the condition they live with the paternal grandparents. Mother was provided with supervised visitation two times per week for two hours.

Mother and Father both tested positive for methamphetamine and marijuana on July 21, 2016. Father admitted to using methamphetamine the night before the detention

hearing on July 20, 2016. As a result, on August 4, 2016, the children were removed from Father's care and placed in a confidential foster home. The family had a prior history with CFS involving allegations of physical abuse and severe neglect in February 2011, and general neglect in March 2013, June 2013, June 2014, and March 2016. CFS found the prior allegations "unfounded."

Father knew that Mother had abused controlled substances and methamphetamines for the last eight years and resided in a tent with the children. He also stated that Mother abused alcohol. The social worker concluded Mother was intoxicated and did not have proper booster seats for the children when the accident occurred.

The jurisdictional hearing was held on August 11, 2016. Both parents were present and filed waiver of rights forms, submitting on the first amended petitions. The juvenile court found true the allegations in the first amended petitions. The dispositional hearing was set for September 8, 2016.

At the dispositional hearing, the children were declared dependents of the court and placed in a foster home. The court provided reunification services to the parents and ordered them to participate in their case plan.

By the six-month review hearing, Mother had made moderate progress in her case plan. She had attended a 12-Step program but had only made it to Step 5. She had also attended general counseling and a parenting course but had displayed negative behavior and succumbed to peer influence. In addition, she was terminated from two outpatient treatment programs and continued to test positive for marijuana. A March 2017 Cedar

4

House report indicated that Mother had been terminated from the Cedar House residential treatment program due to violating house rules, testing positive for substances, using another client's debit card, giving her EBT card to another client to make purchases, and being in a relationship with another client. When confronted about her violations, Mother became argumentative. She was referred to transitional housing.

Mother consistently and regularly visited the children. The visits were described as positive, and the children were happy and excited to see Mother. Mother also attended school meetings addressing D.'s speech deficits and visited the children with food and activities for the children. D. and G. had resided with Ms. and Mr. N. since August 9, 2016, and had developed a bond with their caregivers.

On March 8, 2017, at the six-month review hearing, the juvenile court continued reunification services for both parents and provided the parents with supervised visits twice a week for two hours.

By the 12-month review hearing, CFS recommended terminating the parents' reunification services and setting a section 366.26 hearing. The prognosis for reunification with Mother was poor. Mother had attended multiple substance abuse treatment programs in the past year but had failed to complete a single program. She had tested positive for methamphetamine on May 22, and July 5 and 6, 2017, and failed to test on six occasions between April and July 2017. Mother was given several opportunities to be truthful about her positive methamphetamine results, but instead

5

blamed others and minimized the reasons for her use. Mother's positive drug tests led to her termination from Inland Valley Recovery Services on July 13, 2017.

The social worker opined that Mother failed to demonstrate she could remain sober. She continued to associate with people who abused substances and hindered her progress. Mother admitted that she had the opportunity to move to a sober living home, but chose to reside with her boyfriend, even though the sober living home had the support system she needed, a structured recovery program, and would have allowed her boys to reside with her in the future. The social worker strongly encouraged Mother to make better choices, to no avail. Mother indicated that she wanted to provide the boys with a stable home, but she resided in an uninhabitable residence.

Mother continued to regularly visit the children. The boys appeared bonded with Mother, but her visits remained supervised for their safety. Mother lacked the ability to set boundaries for the boys, who acted out, played too rough, and would not listen to Mother. The caregivers noted that the boys played rough and, as a consequence, sustained bruises and scratch marks. G. was aggressive with other children and attended counseling sessions.

The 12-month review hearing was held on August 21, 2017. At that time, the juvenile court terminated reunification services, ordered ongoing supervised visits, and set a section 366.26 hearing.

On December 11, 2017, CFS requested a 120-day continuance to allow CFS to assess a concurrent planning home for the children.

6

Mother was appropriate with the children at her supervised visits. The boys enjoyed spending time with Mother and were hopeful they would return to her care. Mother genuinely tried to engage in different activities with the boys. The boys adjusted well to their caregivers. However, the caregivers did not want to be considered a concurrent planning home. The boys continued to play rough with each other, and G. also was aggressive with other children.

At the December 19, 2017 section 366.26 hearing, the juvenile court gave CFS authority to place the children in a concurrent planning home, and to publish the children's information in the Heart Gallery, or other such platforms, to locate an adoptive home for the children. A further section 366.26 hearing was set for April 18, 2018.

On March 28, 2018, CFS requested a 90-day continuance to allow CFS more time to locate a concurrent planning home. D. was in kindergarten and G. was in the second grade. Both children appeared to be healthy and developmentally on track. However, G. displayed emotional problems at school. He threw temper tantrums, physically attacked another student, threw furniture, and threatened to cut himself. G.'s caregiver noted that he was moody and unhappy after visits with Mother, and that he was disrespectful to his caregiver. When questioned about his moods, G. indicated he was angry that Mother did so poorly with reunification services. G. received a new therapy referral. D. was polite with his caregivers, but he often fought with G. The boys appeared eager to spend time with Mother but understood that they might not be able to visit her in the future. The social worker opined the likelihood of the children being adopted was good, as a man

7

residing in San Diego, Mr. R., was interested in adopting the children. The children were excited about this prospect. CFS arranged a visit with Mr. R. and the children.

On April 18, 2018, the court set a further section 366.26 hearing for June 18, 2018, to allow the children to transition to Mr. R.'s home.

On June 13, 2018, CFS reported that the boys had transitioned to Mr. R.'s home, but Mr. R. requested their removal because of the boys' behavior. The boys were defiant, destructive, and aggressive with Mr. R.'s dogs, and each other. Mr. R. believed that he was not the best fit to provide the boys with permanency and stability.

At the further section 366.26 hearing on June 18, 2018, the court ordered PPLA with a goal of adoption and set a review hearing for December 18, 2018.

On July 13, 2018, Mother filed a section 388 petition, requesting that the children be returned to her care or, in the alternative, that reunification services be reinstated with liberalized visits. The juvenile court summarily denied Mother's section 388 petition, and this court affirmed the order on October 3, 2019. (See *K.K. v. Superior Court*, *supra*, E073008.)

The children resided with foster parents from June 21, 2018, until July 10, 2019, when they were moved into the prospective adoptive home of Mr. and Mrs. C. The children had adjusted well to the new family and home. They were aware that Mr. and Mrs. C. desired to adopt them and stated that they also wanted to be adopted.

By October 16, 2019, CFS recommended that parental rights be terminated and that the children be freed for adoption. The children were adjusting to their new home

8

and were observed playing and getting along with their prospective adoptive family. Both D. and G. were able to share their concerns, worries, and excitement with Mr. and Mrs. C. Mr. and Mrs. C., in turn, had enjoyed caring for the children and were committed to adopting them. Although Mr. and Mrs. C. had been informed of permanency via legal guardianship, they had already considered the children a part of their family, were looking forward to watching them grow into adulthood, and believed they were most comfortable with the plan of adoption. Initially, D. and G. were hesitant to be adopted by any family, but once they learned more about the family and met them, they were excited to be placed with Mr. and Mrs. C. and be adopted by them. Mr. and Mrs. C. were open to continued contact with the children's birth family. Mother continued to regularly visit the children.

By December 2019, Mr. and Mrs. C. continued to be committed to adopting the boys and providing them with stability and permanency. Their commitment to the children was evidenced by them complying with therapy services for the boys and ensuring their educational needs were met. Both children reported that they were doing well in the home, school, emotionally, physically, and medically. Mr. and Mrs. C. and their two biological children had expressed that they loved D. and G. The children were mutually bonded to their prospective adoptive family and appeared very happy in the home. The social worker noted that it would be detrimental to the children to separate them from the prospective adoptive family. The social worker opined that with the adoptive family, the children would overcome their past issues with the trauma of

9

homelessness, drug addiction, and instability, and grow up and develop in an environment that was supportive and safe.

A contested section 366.26 hearing was held on March 2, 2020. At that time, G., D., and Mother testified. G. testified that he spoke to Mr. and Mrs. C., rather than Mother, when there was something difficult going on in his life because he could "trust them" and they supported him. G. understood the concept of adoption and believed Mr. and Mrs. C. would make good decisions about his life. G. wanted to stay in one place and live there forever and liked living with Mr. and Mrs. C.

G. was nine years old at the time of the hearing, but remembered he lived with Mother when he was about four or five years old. G. recalled visiting Mother once a month supervised by the social worker at CFS's offices. During visits, G. gave Mother a big hug and played games, listened to music, drew, and ate food Mother had brought. G. explained he loved his mother and could trust her, but acknowledged that he had not asked for more contact with Mother. G. also noted that he had been informed he may not be able to see Mother if he was adopted. When asked how he felt about not seeing Mother, G. stated, "I feel sad because I will miss my mom, but I really do want to be adopted." G. further testified that Mr. and Mrs. C. have been there for him consistently when he needed help and that it made him feel happy that he had people he could trust. On cross-examination, G. agreed he would like to continue to see Mother because he "really" loved her, and she played "an important role in [his] life."

10

D., then eight years old, testified that he enjoyed living with Mr. and Mrs. C. because they played Xbox and went on family outings. D. felt comfortable talking to Mr. and Mrs. C. when he had a difficult day. They helped calm him by doing breathing exercises and made him feel safe and protected. D. understood that if the adoption was granted, Mr. and Mrs. C. could decide it would not be a good idea to see Mother. D. stated he wanted to be adopted by Mr. and Mrs. C., but he will miss his "other parents." D. explained that he loved Mother because she brought "stuff" for him and his brother and that he enjoyed seeing Mother, whom he called "Mom."

Mother testified she had been visiting the boys once a month. Her visits had always been supervised since the children were removed on July 18, 2016, when G. was six and D. was four years old. During visits, Mother drew with the boys using colored pencils and crayons she brought with her. She also made gingerbread houses with them. Mother testified that they "really don't talk about anything besides just trying to have a good time." Mother noted that the boys called her "Mom" and that there was a mutual bond between her and her boys. She believed the children were bonded to her because at every visit they told her that they loved and missed her and that they were happy to see her. Mother stated that she had counseled the children through difficult times by asking them to do breathing exercises and squeezing a stress ball.

At the conclusion of the section 366.26 hearing, the juvenile court terminated parental rights, found Mother had not shown the beneficial relationship exception applied, and concluded the children were adoptable. The court explained that the

11

legislative preference was for adoption, that there had been no issue raised as to the care the children received by Mr. and Mrs. C. "other than excellent," and that the children were thriving under Mr. and Mrs. C.'s care. As to the beneficial relationship exception, the court found that there was no doubt Mother loved the children and that there was "some emotional bond with the children," but there was no evidence from Mother that severing the parent-child relationship would deprive the children of a substantial positive emotional attachment, such that the children would be greatly harmed. The court noted that G. indicated he "really" wanted to be adopted, that he trusted Mr. and Mrs. C., that he went to them first when he had a hard day, and that although he loved and trusted Mother, he looked to Mr. and Mrs. C. to fill the parental role. The court further explained that while D. loved his mother, he understood that if he was adopted, his parents will be Mr. and Mrs. C. and that he looked to Mr. and Mrs. C. to fulfill the parental role.

## III

## DISCUSSION

Mother contends she established the existence of the beneficial relationship exception and therefore the juvenile court erred by terminating her parental rights. She argues the juvenile court should have ordered legal guardianship. We disagree.

Section 366.26 governs the proceedings at which the juvenile court must select a permanent placement for a dependent child. The express purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) If the court determines it is likely the child will be adopted, the statute

12

mandates termination of parental rights unless the parent opposing termination can demonstrate that one of the statutory exceptions applies. (§ 366.26, subd. (c)(1)(A) & (B).) In other words, the court must select adoption as the permanent plan unless "the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) The exceptions allow "'the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Id*. at p. 631, quoting *In re Celine R.* (2003) 31 Cal.4th 45, 53.)

Mother contends the exception found in section 366.26, subdivision (c)(1)(B)(i), i.e., the beneficial relationship exception, applied in her case. Recently, in *Caden C.*, our Supreme Court explained, for this exception to apply, a parent is required to show "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would benefit the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) "The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Id*. at p. 632.) "As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' [Citation.] Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Ibid*., quoting

13

*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).) "Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Id.* at p. 633.)

The Supreme Court's decision in *Caden C.* focuses primarily on the third element. The court rejected reliance on whether the parents have complied with their reunification services or case plan and explained, "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life. [Citation.] . . . [T]he effects might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression [or] . . . a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental. [¶] In each case, then, the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child,

14

the court should not terminate parental rights." (*Caden C.*, *supra*, 11 Cal.5th at p. 633, quoting *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

The parent must show that his or her relationship with the child "promotes the well-being of the child to such a degree *as to outweigh* the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575, italics added; accord, *Caden C.*, *supra*, 11 Cal.5th at p. 632 [When "assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home."].) "A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646, disapproved on another ground in *Caden C.*, at pp. 637, fn. 6., 638, fn. 7.) "A parent must show more than frequent and loving contact or pleasant visits." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555 (*C.F.*).)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child and the existence of a beneficial parental relationship for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) We review the third step—whether termination of parental rights would be detrimental to the child due to the child's relationship with his or her parent—for abuse of discretion. (*Id.* at p. 640.)

We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

Here, the juvenile court did not explicitly address regularity of visitation, but substantial evidence in the record supports that Mother maintained regular visitation and contact with the children. The court found Mother had "some emotional bond with the children" and that she undoubtedly loved them. We agree that this finding is supported by substantial evidence. Assuming for the sake of argument that the children would benefit from continuing their relationship with Mother, the issue is whether the children shared such a "substantial, positive[] attachment" to Mother that the harm in severing the parental relationship would "outweigh[ ] 'the security and the sense of belonging a new family would confer.'" (*Caden C.*, *supra*, 11 Cal.5th at pp. 633, 636.)

The juvenile court did not abuse its discretion by determining that any benefits derived from the children's relationship with Mother did not outweigh the benefit of stability through adoption. Under the balancing test set forth in *Autumn H.* and approved by in *Caden C.*, we conclude the juvenile court acted within its discretion in terminating Mother's parental rights.

It was undisputed Mother loved the children and had generally positive visits with them. The record also shows that the children loved Mother, enjoyed their visits with her, and that they would miss her if they could not see her. But, as previously noted, "[a] parent must show more than frequent and loving contact or pleasant visits." (*C.F.*, *supra*, 193 Cal.App.4th at p. 555.) Contrary to Mother's suggestion, there was no evidence that

16

the relationship was so significant as to outweigh the security and stability of an adoptive home. (Cf. *Caden C.*, *supra*, 11 Cal.5th at pp. 633-634 ["When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due* to' the child's beneficial relationship with a parent"]; *id.* at p. 635 [when a child has "'very strong ties'" with a parent, and termination of parental rights "'is likely to be harmful to the child, courts should retain parental ties if desired by both the parents and the child'"].) Although the children loved Mother and enjoyed their visits with her, there was substantial evidence that the children were bonded to Mr. and Mrs. C., whom they considered parental figures. G. testified that Mr. and Mrs. C. have been there for him consistently when he needed help and that it made him feel happy that he had people he could trust. D. testified that he enjoyed living with Mr. and Mrs. C. and felt comfortable talking to them when he had a difficult day. D. also stated that they helped calm him by doing breathing exercises and made him feel safe and protected.

The relationship Mother enjoyed with the children during their visits is not sufficient to demonstrate that Mother and the children shared such a substantial, positive emotional attachment that terminating Mother's parental rights would greatly harm the children. The extent of Mother's influence over the children was necessarily limited; the record supports that foster parents and then Mr. and Mrs. C. acted as primary influential parental figures in the minds of these young children. They did not look to Mother to attend to their physical, developmental, emotional, and other daily needs. (Cf. *Autumn*

17

*H.*, *supra*, 27 Cal.App.4th at p. 575 [positive emotional attachment results from an adult's attention to a child's needs for physical care, nourishment, comfort, affection, and stimulation, typically arising from day-to-day interaction, companionship, and shared experiences].) Moreover, both G. and D. understood the concept of adoption and explicitly stated that they wanted to be adopted by Mr. and Mrs. C.

Further, the record supports that the children's well-being would greatly improve when permanently adopted by fully attentive parents. In fact, since being placed with Mr. and Mrs. C., the children's behaviors improved significantly, and they were thriving emotionally, developmentally, and educationally due to excellent care by their caregivers. (Cf. *Caden C.*, *supra*, 11 Cal.5th at p. 633 [losing the parental relationship might result in "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression"].) Perhaps most importantly, adoption would bring the children stability and permanency they so craved. And the children's self-esteem would improve from a sense of belonging.

Mother also did not present any evidence that the children would be greatly harmed by severance of the parental relationship, or that the security and stability of a new home would not outweigh the loss of that relationship. Although the children testified that they loved Mother and would be sad if they could not see her, they also repeatedly stated that they wanted to be adopted by Mr. and Mrs. C. and did not express any sadness from not being able to live with Mother. There was no evidence that terminating Mother's parental rights would be detrimental to the children. Mother did

18

not, for example, offer a bonding study or other evidence showing that termination of parental rights would have a significant detrimental effect on the children's lives. In fact, the social worker reported that it would be detrimental to the children to separate them from the prospective adoptive family. The social worker opined that with the adoptive family, the children would overcome their past and grow up and develop in an environment that was supportive and safe.

The record fails to show that Mother's relationship with the children was so beneficial to them that it outweighed the benefit they would gain from being adopted. (*Autumn H*., *supra*, 27 Cal.App.4th at p. 575; *Caden C*., *supra*, 11 Cal.5th at pp. 631, 633-634, 636.) Accordingly, the juvenile court did not err in finding that the beneficial relationship exception does not apply in this case.

IV

DISPOSITION

The juvenile court's orders terminating parental rights are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

Acting P. J.

We concur:

FIELDS

J.

RAPHAEL

J.